UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID H. MARRON, <br>     Plaintiff, <br> v. <br> HEALTHSOURCE GLOBAL STAFFING, INC., <br>     Defendant. | Case No. 19-cv-01534-KAW <br><br> **ORDER DENYING MOTION TO REMAND; GRANTING MOTION TO COMPEL ARBITRATION** <br><br> Re: Dkt. Nos. 15, 17 |

On October 18, 2018, Plaintiff David H. Marron filed the instant putative class action against Defendant Healthsource Global Staffing, Inc., asserting violations of various credit reporting laws and California labor laws. (*See* Not. of Removal, Exh. A ("Compl."), Dkt. No. 1.) On March 25, 2019, Defendant removed the case to federal court, asserting federal jurisdiction under the Class Action Fairness Act ("CAFA"). (Not. of Removal ¶ 18.)

Pending before the Court are: (1) Plaintiff's motion to remand, and (2) Defendant's motion to compel arbitration. (Plf.'s Mot. to Remand, Dkt. No. 17; Def.'s Mot. to Compel, Dkt. No. 15.) Having considered the parties' filings, the relevant legal authorities, and the arguments made at the September 5, 2019 hearing, the Court DENIES Plaintiff's motion to remand and GRANTS Defendant's motion to compel arbitration.

## I. BACKGROUND

Defendant "recruits and hires registered healthcare professionals from all over the United States to staff hospitals during labor disputes between [the] hospital and its employees' unions." (Elbahou Decl. ¶ 3, Dkt. No. 1-5.)

### A. Employment Practices

Plaintiff is a former employee of Defendant. (*See* First Amended Compl. ("FAC") ¶ 170.)

Plaintiff alleges that when he applied for employment with Defendant, he was required to fill out a disclosure and authorization form to perform a background investigation. (FAC ¶ 21.) The disclosures, however, "contained extraneous and superfluous language that does not consist solely of the disclosure as required by federal and state laws." (FAC ¶ 22.)

Plaintiff further alleges that he and the putative class performed off-the-clock work. (FAC ¶ 23.) Specifically, Plaintiff asserts that workers "were typically flown by plane to the city where they would be working and would stay at a hotel for the duration of their assignment." (FAC ¶ 24.) On each day of their assignment, they would wait for a bus chartered by Defendants to take them to the job site. There, they would review their new hire paperwork, sign documents, and be given their department assignments. Workers, however, were only considered "on the clock" once they arrived at their department. Thus, Plaintiff alleges Defendants failed to pay workers "for extensive time spent traveling and under the direction and control of Defendants." (FAC ¶ 25.)

While working, Plaintiff alleges that workers were not provided with the necessary meal breaks or rest periods. (FAC ¶¶ 28, 31.) This was due to: "(1) Defendants' policy of not scheduling each meal period [and rest period] as part of each work shift; (2) chronically understaffing each work shift with not enough workers; (3) imposing so much work on each employee such that it made it unlikely that any employee would be able to take their breaks if they wanted to finish their work on time; and (4) no formal written meal and rest period policy that encouraged employees to take their meal and rest periods . . . ." (FAC ¶¶ 28, 31.) Plaintiff further alleges that workers "generally worked 12-hour shifts and were entitled to a minimum of three 10-minute rest periods," but that they "were typically only provided with one rest period." (FAC ¶ 32.) Plaintiff also alleges that Defendants agreed to pay its workers a daily per diem for food, but that they "did not receive the agreed upon per diem from defendants." (FAC ¶¶ 35-36.)

Because of these practices, Plaintiff asserts that workers did not receive accurate wage statements, as their statements failed to accurately reflect all hours worked and premium wages for missed meal and/or rest periods. (FAC ¶¶ 38-41.) Additionally, Plaintiff alleges that Defendant failed to timely pay wages earned to employees who were terminated or resigned. (FAC ¶ 166.)

### B. Arbitration Agreement

To be eligible for employment, an applicant creates an account through Defendant's website using a unique e-mail address and password. (Elbahou Decl. ISO Mot. to Compel, Dkt. No. 3.) Defendant updates its database so that applicant can view potential strike assignments. (*Id.* ¶ 6.) An interested applicant can "nominate" herself for consideration. Once a hospital receives a notice of a union's intent to strike, an applicant that has nominated herself for that strike will receive new action items, including completing the operative arbitration agreement and various human resources forms. (*Id* ¶ 8.)

Plaintiff created his account on June 18, 2012. (Elbahou Decl. ISO Mot. to Compel ¶ 12.) On December 1, 2017, Plaintiff nominated himself for consideration for an anticipated May 2018 strike.[1] (*Id.* ¶ 15.) On April 28, 2018, Plaintiff electronically signed the Arbitration Agreement. (*Id.* ¶ 15, Exh. C ("Arbitration Agreement").) The Arbitration Agreement states:

> The Parties mutually agree that any and all disputes arising out of, in connection with, or relating to your employment agreement with HealthSource, your employment with HealthSource, and any and all previous and future employment relationships with HealthSource, including with respect to the termination of such employment or other and any dispute as to the validity, interpretation, construction, application or enforcement of any provision of the operative employment agreement, shall be submitted to binding arbitration before a neutral arbitrator. Except as otherwise required under applicable law, (1) The Parties expressly intend and agree that class action and representative procedures shall not be asserted, nor will they apply, in any arbitration pursuant to your employment, your employment agreement, or this Agreement; (2) The Parties agree that each will not assert class action or representative action claims against the other in arbitration or otherwise; and (3) each of the Parties shall only submit their own, individual claims in arbitration and will not seek to represent the interests of any other person.

(Arbitration Agreement ¶ 2.) Arbitration is conducted by the American Arbitration Association ("AAA"), and subject to the AAA's Employment Arbitration Rules. "Costs unique to the arbitration, such as the arbitrator's fee, will be paid by [Defendant]." (*Id.*)

The Arbitration Agreement further states: "this Agreement shall not apply to any dispute if

---

[1] Plaintiff also signed different arbitration agreements in February 2016 and May 2016. (Elbahou Decl. ISO Mot. to Compel ¶¶ 13-14.) Defendant, however, only seeks to enforce the Arbitration Agreement signed on April 28, 2018. (*See* Def.'s Mot. to Compel at 4 n.1.)

3

an agreement to arbitrate such dispute is prohibited by law." (Arbitration Agreement ¶ 3.) Finally, the Arbitration Agreement permits a signee to opt-out; a signee "must (1) personally notify HealthSource in writing that you are revoking this agreement, and (2) e-mail the revocation notice to humanresroucesdepartment@healthsourceglobal.com or mail it to HealthSource Global Staffing, Inc., 39270 Paseo Padre Parkway #138 Fremont, CA 94538, so that your revocation is received no later than thirty (30) days after I sign this agreement." (Arbitration Agreement ¶ 7.) The e-mail for opting out is misspelled.

### C. Procedural History

On October 18, 2018, Plaintiff filed the instant case in state court. On December 18, 2018, Plaintiff filed an amended complaint, adding a California's Private Attorneys General Act ("PAGA") claim. (FAC ¶¶ 201-04.) On behalf of a FCRA Class, ICRAA Class, and CCRAA Class, Plaintiff alleged violations of the Fair Credit Reporting Act, the Investigative Consumer Reporting Agencies Act, and Consumer Credit Reporting Agencies Act, respectively. (FAC ¶ 13.)

Plaintiff also sought to represent an Hourly Employees Class, made up of "[a]ll persons employed by Defendants and/or any staffing agencies and/or any other third parties in hourly or non-exempt positions in California . . . ." (FAC ¶ 13.) On behalf of the Hourly Employees Class, Plaintiff alleged violations for failure to pay hourly and overtime wages. (FAC ¶ 146.) The Hourly Employees Class includes four subclasses: (1) the meal period sub-class, made up of Hourly Employees Class members who worked in a shift in excess of five hours; (2) the rest period sub-class, made up of Hourly Employees Class members who worked a shift of at least 3.5 hours; (3) the wage statement penalties sub-class, made up of Hourly Employee Class members who were employed by Defendant during the period beginning one year before the filing of the action through the entry of final judgment; and (4) the waiting time penalties sub-class, made up of Hourly Employee Class members who separated from their employment during the period beginning three years before the filing of the action through entry of final judgment. (FAC ¶ 13.) Plaintiff also seeks to represent a UCL Class, made up of all Hourly Employee Class members, and an Expense Reimbursement Class, made up of all persons employed by Defendant who incurred business expenses. (FAC ¶ 13.)

4

On March 25, 2019, Defendant removed the case from state court, asserting CAFA jurisdiction.[2] (Not. of Removal ¶ 18.) In support of removal, Defendant provided a declaration by its Vice President, Tabi Elbahou. Based on his review of the corporate records, Mr. Elbahou states that there were 10,500 individuals in the FCRA Class, 7,925 individuals in the ICRAA Class, and 9,300 individuals in the CCRAA Class. (Elbahou Decl. ¶¶ 8-10.) Mr. Elbahou further states that there were approximately 4,600 Hourly Employee Class members who worked at least one day in California in the four years prior to the filing of the complaint. (Elbahou Decl. ¶ 7.) The Hourly Employee Class members worked approximately 7,250 assignments during those four years, 6,900 assignments in the three years prior to the filing of the complaint, and 2,400 assignments in the one year prior to the filing of the complaint. (Elbahou Decl. ¶¶ 12, 14, 15.) Mr. Elbahou further states that Hourly Class Members were placed in temporary positions at hospitals during organized labor stoppage, and the average labor stoppage lasted five days. (Elbahou Decl. ¶ 11.) Hourly Class Members earned an average of $55/hour, and typically worked shifts of at least eight hours per day. (Elbahou Decl. ¶ 13.)

Based on these numbers, Defendant estimated that: (1) the FCRA claim was worth $105,000; (2) the meal period claim was worth $797,500; (3) the rest period claim was worth $1,993,750; (4) the hourly and overtime claim was worth $1,143,760; (5) the unreimbursed business expenses claim was worth $181,250; (6) the wage statement penalties claim was worth 120,000; (7) the waiting time penalties claim was worth $9,108,000; and (8) Plaintiff's attorney's fees claim was worth $3,362,315, or 25% of the estimated damages. (Not. of Removal ¶¶ 40, 43-50.)

On June 27, 2019, Defendant filed a motion to compel arbitration. On July 11, 2019, Plaintiff filed his motion to remand, and his opposition to Defendant's motion to compel. (Plf.'s Opp'n, Dkt. No. 18.) On July 18, 2019, Defendant filed its reply. (Def.'s Reply, Dkt. No. 20.) On July 25, 2019, Defendant filed its opposition to Plaintiff's motion to remand. (Def.'s Opp'n,

---

[2] Although Plaintiff has a FCRA claim, Defendant only removed on the basis of CAFA jurisdiction. Defendant explicitly disclaims removal under federal question jurisdiction. (Def.'s Opp'n at 2, Dkt. No. 21.)

5

1  Dkt. No. 21.) On August 2, 2019, Plaintiff filed his reply. (Plaintiff's Reply, Dkt. No. 22-1.)

## II. LEGAL STANDARD

### A. Motion to Remand

In general, "a defendant seeking to remove a case to a federal court must file in the federal form a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014) (quoting 28 U.S.C. § 1446(a).) When a defendant removes a case, the "notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Id.* at 554. From there, "the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." *Id.* at 553. If, however, the plaintiff contests the amount in controversy, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* at 554 (citing 28 U.S.C. § 1446(c)(2)(B)).

The defendant who seeks removal has the burden to show by a preponderance of evidence that the amount in controversy is adequate. *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). To do so, "[t]he parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Id.* (internal quotation omitted). Under this standard, "a defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions." *Id.*

With respect to CAFA, "CAFA gives federal district courts original jurisdiction over class actions in which the class members number at least 100, at least one plaintiff is diverse in citizenship from any defendant, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs." *Ibarra*, 775 F.3d at 1195. "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damage exposure." *Id.* at 1198. Notably, the Ninth Circuit has explained that "Congress and the Supreme Court have instructed [the courts] to interpret CAFA's provisions . . . broadly in favor of removal . . . ." *Jordan v.*

*Nationstar Mortg. LLC*, 781 F.3d 1178, 1184 (9th Cir. 2015); *see also Ibarra*, 775 F.3d at 1197 ("Congress intended CAFA to be interpreted expansively").

### B. Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of a contract." 9 U.S.C. § 2. "Once the Court has determined that an arbitration agreement relates to a transaction involving interstate commerce, thereby falling under the FAA, the court's only role is to determine whether a valid arbitration agreement exists and whether the scope of the dispute falls within that agreement." *Ramirez v. Cintas Corp.*, No. C 04-281-JSW, 2005 WL 2894628, at *3 (N.D. Cal. Nov. 2, 2005) (citing 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

## III. DISCUSSION

### A. Motion to Remand

#### i. Amount in Controversy

The parties dispute whether Defendant has established the $5 million amount in controversy. The Court finds that Defendant's estimate of the wage-related claims is adequate to satisfy CAFA's $5 million requirement.[3]

##### a. Unpaid Wages, Overtime, and Liquidated Damages

Defendant estimates that the unpaid hourly and overtime wages is $1,143,760.00. (Def.'s Opp'n at 15.) Defendant calculates that the unpaid wages claim is $398,750 ($55/hour average salary x 1 hour unpaid straight per assignment x 7,250 total assignments), the overtime claim is $598,125 ($82.50/hour average overtime rate x 1 hour unpaid overtime per assignment x 7,250 total assignments), and the liquidated damages claim is $146,885 ($10.13 average minimum wage x 2 unpaid hours per assignment x 7,250 total assignments).

Plaintiff argues that Defendant cannot assume that each person employed by defendant

---

[3] The parties also disagree as to whether the putative class includes all employees or all employees who have suffered a violation. (*See* Plf.'s Mot. to Remand at 10; Def.'s Opp'n at 8-10.) As discussed below, this is a distinction without a difference, as the Court finds that Plaintiff's allegations demonstrate a 100% violation rate as to unpaid wages and overtime.

7

missed an average of one hour of unpaid wages and one hour of overtime because "[i]t is very likely that many of the former California employees have no claim whatsoever for unpaid wages during the relevant time period because they were paid for all hours worked." (Plf.'s Mot. to Remand at 11.) Plaintiff suggests that Defendant should have determined which employees were required to travel on which assignments, as well as which employees worked shifts in excess of eight hours. (Plf.'s Reply at 7.)

The Court disagrees. Plaintiff's unpaid wages and overtime claim are based on Defendant's failure to pay for: (1) travel time to the city where the workers would be working, (2) wait and travel time between the hotel and the hospital site, and (3) time spent at the job site to check in, review and sign new hire paperwork and other necessary documents, receive their department assignments, and go to their assigned department. (FAC ¶ 24.) These are activities that every worker would have to go through on every assignment, as a worker would always have to travel to the hospital, travel between the hotel and hospital site, and fill out paperwork and receive their assignments. There is no suggestion by Plaintiff that Defendant ever paid for this time for some individuals; indeed, Plaintiff alleges that Defendant's policy not to pay was a "centrally devised polic[y] and practice[]." (FAC ¶ 145.) There is also no argument that workers were never required to travel to the hospital, travel between the hotel and the hospital, or complete paperwork. Thus, every worker would have suffered a violation. It is therefore reasonable, based on Plaintiff's allegations, that every worker would have suffered a failure to pay wages. *Compare with Mejia v. DHL Express (USA), Inc.*, No. CV 15-890-GHK (JCx), 2015 WL 2452755, at *4 (C.D. Cal. May 21, 2015) (finding 100% violation rate where the complaint "does not contain any allegations that suggest a 100% violation rate is an impermissible assumption," but instead alleged that the company had unlawful policies that were uniformly "adopted and maintained").

Further, the Court finds it reasonable to find that each worker would have missed at least one hour of unpaid wages. Plaintiff alleges unpaid work that would take a significant amount of time, including being flown to the city in which the hospital was located, travelling each day between the hotel and hospital, and filling out paperwork and receiving department assignments. Likewise, the Court finds it reasonable that each worker would have missed at least one hour of

8

overtime. In addition to the significant amount of uncompensated time being alleged, Plaintiff has alleged that workers "generally worked 12-hour shifts," while Defendant states that its records show each worker "typically worked shifts of at least 8 hours per day." (FAC ¶ 32; Elbahou Decl. ¶ 13.) Thus, any unpaid time on an average workday – such as waiting for and taking the bus from the hotel to the hospital – would be overtime. Over an average five-day assignment, such travel time would easily amount to one hour.

Accordingly, the Court finds that Defendant has demonstrated by a preponderance of evidence that this claim is worth $1,143,760.00.

### b. Wage Statement Penalty

California Labor Code § 226(a) requires that employers provide employees "an accurate itemized statement in writing," which includes, for example, the gross wages earned, total hours worked by the employee, all deductions, and net wages earned. If the employer knowingly and intentionally fails to provide accurate wage statements, the employee "is entitled to recover the greater of all actual damages or fifty ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period . . . ." Cal. Labor Code § 226(e)(1). Unless the plaintiff demonstrates actual damages resulting from the receipt of an inaccurate wage statement, the limitations period is one year. *See Fong v. Regis Corp.*, Case No. 13-cv-4497-RS, 2014 WL 26996, at *6 n.5 (N.D. Cal. Jan. 2, 2014).

Here, Defendant estimates that the wage statement penalties claim is worth $120,000, or $50 x 2,400 wage statements during a one-year period. (Def.'s Opp'n at 17.) Again, Plaintiff argues that this estimate fails because it assumes that all employees were provided with at least one non-compliant wage statement for every assignment. (Plf.'s Reply at 1.) As discussed above, the Court disagrees because based on Plaintiff's allegations, every worker was deprived of straight pay and overtime due to Defendant failing to pay for travel time, waiting time, and time spent completing new hire paperwork. Accordingly, every worker's wage statement would be inaccurate. *See Mejia*, 2015 WL 2452755, at *5 ("if Defendant had a uniform policy of failing to provide rest periods, as discussed above, the wage statements that Defendant provided would necessarily have been accurate 100% of the time because each wage statement would have failed

to include compensation for the missed rest break"). The Court concludes that Defendant has demonstrated by a preponderance of evidence that this claim is worth $120,000.

    c. Waiting Time Claim

California Labor Code § 203(a) provides: "If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced, but the wages shall not continue for more than 30 days."

Defendant estimates that the wage statement penalty is $9,108,000, assuming a 10% violation rate ($440 average daily pay x 30 days x 6,900 total assignments x 10%). Plaintiff again challenges Defendant's assumption that every employee did not timely receive wages due, as Plaintiff suggests some employees may have been paid timely and complete wages or received their complete wages late. (Plf.'s Mot. at 13.) Again, this is not consistent with Plaintiff's allegations, which describe a policy in which *no* worker was ever paid for travel time, waiting time, and time spent completing new hire paperwork. Thus, it would be reasonable to even assume a 100% violation rate, rather than the 10% violation rate that Defendant relies upon.[4] The Court concludes that Defendant has demonstrated by a preponderance of evidence that this claim alone is worth more than the $5 million amount-in-controversy required by CAFA. Accordingly, the Court need not consider whether Defendant has adequately demonstrated its estimates for Plaintiff's claims for missed meal and rest periods, unpaid expenses, and credit reporting act violations, as well as attorney's fees and costs.

  **ii. FCRA Claim**

Plaintiff argues that even if the Court finds there is CAFA jurisdiction, the Court should sever the FCRA claim and remand it to state court because there is no basis for subject matter jurisdiction. (Plf.'s Reply at 13.) Plaintiff contends that because he has not adequately alleged

---

[4] Plaintiff does not appear to challenge Defendant's assumption that every assignment ended in the end of the worker's employment. (*See* Plf.'s Mot. to Remand at 12-13; Plf.'s Reply at 8-9.) Defendant's assumption is based on Plaintiff's allegation that for each assignment, he and putative class members filled out new hire paperwork. (Def.'s Opp'n at 19; FAC ¶ 24.) Thus, Plaintiff's complaint can be fairly read as alleging that each new assignment represented a separate employment, requiring the payment of final wages thereafter.

10

Article III standing, there is no federal question jurisdiction, and thus the Court has no jurisdiction over the FCRA claim.

The Court disagrees. The Court does not require federal question jurisdiction over the FCRA claim because there is CAFA jurisdiction over the entire case. Neither *Manaspit v. Deluxe Corporation* and *Williams v. Nichols Demos, Inc.*, cited by Plaintiff, concern CAFA jurisdiction. With respect to *Moore v. United Parcel Service, Inc.*, the district court found that it did not have to consider the FCRA claims in calculating whether CAFA's amount in controversy requirement was satisfied because there was no federal question jurisdiction over that claim due to lack of Article III standing. Case No. 18-cv-7600-VC, 2019 WL 2172706, at *1 (N.D. Cal. May 13, 2019).[5] This is a separate issue from whether the Court can sever a particular claim where there is in fact CAFA jurisdiction. Indeed, the *Moore* court found that there was no federal jurisdiction over any claim in that case, whether under federal question or CAFA. *Id.*

Accordingly, the Court denies Plaintiff's request to sever and remand the FCRA claim.

### iii. Jurisdictional Discovery

Finally, Plaintiff challenges the sufficiency of the Elbahou declaration, arguing that he did not affirmatively state that he reviewed time records or pay records. (Plf.'s Reply at 11.) Mr. Elbahou, however, does state that he reviewed corporate records in determining how many individuals worked for Defendant during which time periods, their average hourly rate, the total number of assignments, and the typical shift length. (Elbahou Decl. ¶¶ 7-10, 12-15.) Plaintiff cites no authority that a declaration must be based on specific types of records, or that it must state what records were reviewed.

In the alternative, Plaintiff seeks leave to depose Mr. Elbahou and conduct discovery of the documents and information reviewed by Mr. Elbahou. (Plf.'s Reply at 13.) "Jurisdiction discovery is permissible when the Court is unable to determine, on the existing record, whether it has jurisdiction." *Rippee v. Boston Mkt. Corp.*, 408 F. Supp. 2d 982, 985 (S.D. Cal. 2005) (citing

---

[5] The Court respectfully disagrees with this holding. It is unclear why a court must have federal question jurisdiction over a claim before it may consider its value for CAFA purposes. The very purpose of CAFA is to permit federal jurisdiction where diversity jurisdiction or federal question jurisdiction would not otherwise exist.

11

*Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)). While Plaintiff expresses doubt as to the veracity of Mr. Elbahou, Plaintiff cites no authority that jurisdictional discovery is warranted in this case, nor any basis for his concerns. As discussed above, the record was sufficient for the Court to determine that it has jurisdiction, and therefore jurisdictional discovery is not necessary.

### B. Motion to Compel Arbitration

In opposing Defendant's motion to compel arbitration, Plaintiff argues only that the arbitration agreement is unconscionable. (Plf.'s Opp'n at 4.) Under California law, the party opposing arbitration bears the burden of proving that the arbitration provision is unenforceable. *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1149 (2013). The arbitration agreement must be both procedurally and substantively unconscionable at the time it was made to be unenforceable. *See Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015). The arbitration agreement, however, does not need to be equally procedurally and substantively unconscionable – "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).

#### i. Procedural Unconscionability

Procedural unconscionability "addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power." *Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev.*, 55 Cal. 4th 223, 246 (2012). Here, the parties dispute whether the Arbitration Agreement is a contract of adhesion, given that there is an opt-out provision.

The Court finds that the opt-out provision is illusory, such that the Arbitration Agreement is a contract of adhesion. The opt-out provision requires that a worker satisfy two conditions: first, she must "personally notify Healthsource in writing that you are revoking this agreement," and second, she must e-mail[6] or mail a revocation notice. (Arbitration Agreement ¶ 7.) As

---

[6] The Court also notes that the e-mail address for opting out is incorrect. As previously noted in *Posephny v. AMN Healthcare Inc.*, this is troubling, as it effectively misrepresents to workers how

12

Plaintiff correctly points out, the opt-out provision fails to explain who the worker should be "personally notify[ing]," whether it is a supervisor, Human Resources, or some other individual. (Plf.'s Opp'n at 5.) Moreover, by its own terms, the e-mailed or mailed revocation does not satisfy this condition, as the Arbitration Agreement specifically states that the worker must perform *both* separate acts. Thus, it is not clear how a worker could ever satisfy the requirements of the opt-out provision.

In so finding, the Court finds Defendant's citation to *Mohamed v. Uber Technologies, Inc.* distinguishable. (Def.'s Reply at 3.) *Mohamed* concerned a provision that required drivers "to opt out either in person at Uber's San Francisco offices or by overnight delivery service . . . ." 848 F.3d 1201, 1210 (9th Cir. 2016). The Ninth Circuit found that while this was burdensome, Uber was still bound to accept opt outs from the drivers who followed the procedures set forth. *Id.* at 1211. Thus, the opt-out provision was not illusory. Here, in contrast, the concern is not that personally notifying Defendant is burdensome, but that there is no practical way for a worker to satisfy this condition. If a worker cannot satisfy the first condition at all, a worker can never opt out, and therefore the opt-out provision is illusory. Without an opt-out provision, the contract is effectively one of adhesion, and therefore there is procedural unconscionability.[7]

### ii. Substantive Unconscionability

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessment of whether they are overly harsh or one-sided." *Pinnacle Museum Tower Ass'n*, 55 Cal. 4th at 246. Terms are unconscionable if they are "overly harsh, unduly oppressive, so one-sided as to 'shock the conscience,' or unfairly on-sided." *Sanchez*, 61 Cal. 4th at 910-11 (internal

---

to opt out of the Arbitration Agreement. *See* Case No. 18-cv-6284-KAW, 2019 U.S. Dist. LEXIS, 18593, at *20 (N.D. Cal. Feb. 5, 2019).

[7] Defendant suggests that in *Posephny*, the Court already upheld the validity of the Arbitration Agreement's opt-out procedure. (Def.'s Reply at 3.) The Court made no such finding. First, the *Posephny* plaintiff did not argue unconscionability, or even challenge the terms of the Arbitration Agreement. Rather, the plaintiff argued that the Arbitration Agreement was superseded by a separate agreement, extinguished by revocation, or waived. 2019 U.S. Dist. LEXIS 18593, at *9. Second, while the Court did address the issue of the e-mail address, the Court ultimately found that whether the e-mail address was incorrect was irrelevant for purposes of waiver because the plaintiff did not attempt to opt out before the opt-out period expired. *Id.* at *20-21.

13

quotations omitted). The Court must also look for terms that are "unreasonably favorable to the more powerful party" and "provisions that seek to negate the reasonable expectations of the nondrafting party." *Id.* at 911. In the instant case, the Court finds there is no substantive unconscionability in the Arbitration Agreement.

### a. PAGA Waiver

Plaintiff argues there is substantive unconscionability due to a PAGA waiver. (Plf.'s Opp'n at 6.) As the Ninth Circuit explained, however, a PAGA waiver is not substantively unconscionable. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1264 (9th Cir. 2017). Rather, California courts have found that PAGA waivers are unenforceable as a matter of *public policy*. *Id.* at 1263; *see also Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 384 (2014) ("an employment agreement [that] compels the waiver of representative claims under the PAGA . . . is contrary to public policy and unenforceable as a matter of state law."). "Under California law, 'contracts can be contrary to public policy but not unconscionable and vice versa.'" *Poublon*, 846 F.3d at 1264 (quoting *Sonic-Calabas A, Inc.*, 51 Cal. 4th at 686-87). Thus, while the PAGA waiver is unenforceable as a matter of public policy, that does not make it unconscionable.

### b. Carve Out

Plaintiff argues that the Arbitration Agreement does not expressly carve out certain claims, specifically claims for public injunctive relief, administrative claims, worker's compensation claims, and unemployment insurance. (Plf.'s Opp'n at 7-10.)

#### 1. Public Injunctive Relief

In contrast to private injunctive relief, which "primarily resolves a private dispute between the parties and . . . benefits the public, if at all, only incidentally," public injunctive relief is "relief that by and large benefits the general public and that benefits the public, if at all, only incidentally and/or as a member of the general public." *McGill v. Citibank*, 2 Cal. 4th 945, 955 (internal quotations omitted). "Contracts that prevent all adjudication of public injunctive relief—in any forum—are impermissible under California law." *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 900 (N.D. Cal. 2018) (citing *McGill*, 2 Cal. 5th at 961-62). A contract that requires arbitration, however, is still valid and enforceable if it allows the arbitrator to award public

14

injunctive relief. *Id.*

In *Magana*, the district court found that the arbitration agreement was enforceable because the arbitration agreement "does not prevent adjudication of public injunctive relief in any forum, [as] the arbitrator may adjudicate a claim for such relief." 343 F. Supp. 3d at 901. Although the arbitration agreement stated that the "'arbitrator shall not have any authority to hear or arbitrate any class, collective or representative action,'" the district court explained that "a claim for public injunctive relief is not a class, collective, or representative action." *Id.* (citing *McGill*, 2 Cal. 5th at 959-61). Moreover, the arbitration agreement specifically allowed the arbitrator to award all remedies that would be available in a court, except as provided in a class action waiver. *Id.*

Here, Plaintiff fails to explain how the Arbitration Agreement prevents the award of public injunctive relief. Plaintiff contends that Paragraph 5 of the Arbitration Agreement "limit[s] the kind of injunctive relief that Plaintiff may seek to those that may 'aid and give effect to the arbitration.'" (Plf.'s Opp'n at 9.) Paragraph 5, however, only states: "The Parties agree that nothing in this Section shall prevent either of the Parties from seeking interim equitable relief in the federal or state courts of the state in which the majority of work was performed for this assignment to aid and give effect to the arbitration required by this Agreement." (Arbitration Agreement ¶ 5.) Paragraph 5 only concerns when a party may seek interim equitable relief from the courts; it does not limit the type of relief that the *arbitrator* may provide, nor does any other provision of the Arbitration Agreement. Indeed, the Arbitration Agreement requires that arbitration be conducted pursuant to the AAA's Employment Arbitration Rules, which state: "The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court . . . ." (AAA Employment Arbitration Rules and Mediation Procedures ¶ 39(d), *available at*: https://www.adr.org/employment (last accessed Aug. 23, 2019).)

Accordingly, the Court finds that the arbitration agreement does not prevent the award of public injunctive relief.

### 2. Administrative Claims

Next, Plaintiff argues that the Arbitration Agreement would require employees to arbitrate administrative claims that would otherwise be determined by the Equal Employment Opportunity

15

Commission, or any other state agency charged with enforcing employment laws. (Plf.'s Opp'n at 9.) Plaintiff contends this is substantively unconscionable because an employee who would otherwise seek relief from the government agency will now have to "incur the expense of arbitration." (*Id.*)

As an initial matter, it is not clear what provision Plaintiff relies on to argue that the Arbitration Agreement requires the arbitration of administrative claims. Further, even if it did, the Arbitration Agreement requires that "[c]osts unique to arbitration, such as the arbitrator's fee, will be paid by" Defendant. (Arbitration Agreement ¶ 2.) Thus, Plaintiff's argument that this provision would require the employee to incur the additional expenses of arbitration is inaccurate, as the Arbitration Agreement requires that Defendant pay such fees. The Court finds that this provision – to the extent it exists – is not unconscionable.

3. Workers' Compensation Claims and Unemployment Insurance

Finally, Plaintiff contends that the Arbitration Agreement waives an individual's right to relief under the applicable workers' compensation laws and for unemployment benefits. (Plf.'s Opp'n at 9.) Defendant does not dispute that such claims cannot be arbitrated; rather, Defendant argues these claims are subject to the Arbitration Agreement's carve-out provision, which states: "this Agreement shall not apply to any dispute if an agreement to arbitrate such dispute is prohibited by law." (Def.'s Reply at 6-7; Arbitration Agreement ¶ 3.)

Plaintiff, in turn, suggests that this provision is not a carve out because it is "ambiguous and susceptible to different interpretations." (Plf.'s Opp'n at 10.) Plaintiff argues that this sentence could be read as stating that *no* claim need be arbitrated if an agreement to arbitrate any particular claim is prohibited by law. (*Id.*) Specifically, Plaintiff states:

> [L]et's assume that the universe of possible claims involves just two claims; an A claim and a B claim. Let's further assume that under existing law, an agreement to arbitrate a B claim is prohibited by law. Therefore, in construing the one sentence: Furthermore, this Agreement (meaning the arbitration agreement) shall not apply to any dispute (any of the claims in our universe of A and B claims) if an agreement to arbitrate such dispute is prohibited by law (the B claim). Because the B claim is prohibited by law, the Arbitration Agreement, by its own terms, states that it "shall not apply to any dispute" (both the A claim and B claim).

16

(Plf.'s Opp'n at 10.)

The Court finds this reading untenable, as it requires reading out "such dispute." The "such dispute" limits which disputes are affected by the clause, such that the carve-out provision does not apply to all disputes, only those that cannot be arbitrated as a matter of law. Thus, based on the carve-out provision, the Arbitration Agreement would not apply to the workers' compensation or unemployment insurance claims if an agreement to arbitrate those disputes is prohibited by law. Accordingly, there is no unconscionability.

As Plaintiff has failed to establish any substantively unconscionable provision in the Arbitration Agreement, the Court finds that the Arbitration Agreement is not unconscionable. Therefore, Defendant's motion to compel must be granted.

## IV.     CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's motion to remand, and GRANTS Defendant's motion to compel arbitration. The Court shall stay the proceedings in the instant case pending resolution of the arbitration. 9 U.S.C. § 3.

IT IS SO ORDERED.

Dated: September 13, 2019

_____
KANDIS A. WESTMORE
United States Magistrate Judge